## McFarland's Appeal.

*First Taker in Will preferred.—Sale of unproductive Lands, when ordered.*

1. The first taker in a will is presumed in law to be the favourite of the testator.

2. Where one who had sold lands on an agreement under which they reverted to him before his death, but who died, leaving unaltered a will, in which he gave a life estate in all his property, real, personal, and mixed, to his widow, with legacies to others after her death—basing these legacies on the price of the lands so as aforesaid sold, and providing for a *pro rata* abatement of the money legacies, if the land should revert to him, at a reduced value—it was *held* that a sale of the land might be ordered after his death by the court, under the Act of 24th of February 1834, on the petition of the widow, and for her support, under the will.

3. Where there is a general authority to sell, without naming the executors, and there is a controversy as to their right to sell, it is a proper case for an order of the court under the Act of Assembly.

THIS was an appeal from the decree of the Orphans' Court of *Allegheny county*, dismissing the petition of Mrs. Catharine McFarland, widow of Joseph McFarland, deceased, praying for an order directing the executors of the decedent to sell certain real estate.

The petition set forth: That the testator was the owner of about 65 acres of land, in Peebles township, of said county, and on the 7th of November 1853, sold, by articles of agreement, to Thomas Woods, about 60 acres of it, for $30,000, the principal not to be paid for several years, but to bear semi-annual interest, and the title to be made as Woods might sell portions of it, under certain conditions and restrictions, and providing for a reversion of the property on a failure to pay the interest. That the object of this sale was to provide a liberal support for petitioner after testator's decease. That testator made his will dated the 27th August 1855, and died 3d December 1857. That in said will he bequeathed to the petitioner all his property of whatsoever kind, character, or description, whether real, personal, or mixed, for and during her natural life, to be under her entire, absolute, and unlimited control, management, and supervision, to receive all the proceeds, rents, issues, and profits, and dispose of them in any manner she might deem proper. And after the death of his wife, as the testator had no children, he disposed of his estate among his collateral kindred, and among the nephews and nieces of his wife, and to certain benevolent societies, as follows, to wit:—

The house and lot on which he lived (not included in his sale to Woods) to the four sons of Richard Bard; and a lot adjoining

[McFarland's Appeal.]

the same to be sold by his executors, the proceeds to go to the Presbyterian Board of Domestic Missions; that he then gave to sundry persons certain money bequests to the amount of $28,000, directing them to be paid out of the proceeds of the sale to Thomas Woods. And provided that, if the said land sold to Woods should revert or come back to the testator or to his executors, and should sell for less than $30,000, the said money legacies should abate *pro rata*, or if it should sell for more than $30,000, the excess should go to the American Bible Society. That the land reverted to testator in consequence of the failure of Woods to pay the interest, a short time before his decease. And that the executors, by order of court, had sold about 5 acres of the tract to pay debts, still leaving about 55 acres.

The petition described the tract of land, and stated that it was very unproductive, that it would not rent for more than $150, after paying taxes and repairs; that several of the legatees interested in it were minors; that it was to the interest of all the parties interested to have it sold; that it was the plain meaning of the will that it should be resold by the executors; and that it was absolutely necessary to sell it to carry out the intention of the testator, and provide a competent support for petitioner.

The petition then set forth the names and residences of all the legatees, and asked that a citation might be issued, directed to the legatees and the executors, to show cause why an order should not be granted for the sale of the tract of land as prayed for by the petitioner.

Guardians *ad litem* were appointed for the minors.

The sheriff returned the citation, "service accepted by John M. Kirkpatrick, as attorney for the executors, and service accepted by the other heirs as per schedule annexed." The paper annexed to the sheriff's return, set forth that it was to the interest of the parties interested to have the property sold now, and expressly gave consent for the sale as prayed for. It was signed by all the legatees and all parties interested of full age, and by the guardians of the minors.

The executors, Robert Wilson and William N. Burchfield, answered the citation, that under the will they did not believe they had power to sell, but submitted that question to the decision of the court. They also set forth that in the will they were appointed trustees for the children of Olivia McGahan, to whom there was a legacy of $3000—and that they did not believe it was to the interest of those children that the property should be sold now.

The American Bible Society was not made a party in the petition, but the agent appeared and opposed the sale, and at his instance the society was made a party.

[McFarland's Appeal.]

The provisions of the will necessary to a correct understanding of the case, are as follows:—

"Item.—I give, devise, and bequeath to my beloved wife, Catharine McFarland, if she shall survive me, all of my property, of whatsoever kind, character, or description, whether real, personal, or mixed, for and during her natural life.

"The same to be under her entire, absolute, unconditional, unlimited, and unrestricted control, management, and supervision, to receive all the proceeds, rents, issues, and profits of the same, and dispose of them in any manner she may deem proper and right. It being hereby my intention and desire that she shall during, and for her natural life, occupy and be in my position, place, and stead.

"Item.—After the death of my beloved wife, Catharine McFarland, it is my will and desire that all my property and estate, real, personal, or mixed, shall be disposed of, and I do hereby dispose of it as follows, to wit: (Here follow a number of bequests.)

"Item.—Whereas, all the bequests in money, hereinbefore made, are to be paid out of the purchase-money of certain property sold by me, as per articles of agreement, to Thomas Woods, Esq., for the sum of thirty thousand dollars ($30,000), and, whereas, the same was sold as aforesaid, in such manner (as by reference to said articles of sale will appear) as that the said property may revert back to me, or my executors, by possibility; and, whereas, by the time of such reversion (if such reversion should happen), the land sold as aforesaid may have decreased in value, I order and direct that in case of a decrease, and that the land should not be of the value of thirty thousand dollars ($30,000), for which amount it has been sold, and upon which I have based my calculations, and made my bequests accordingly, the deficit or decrease shall be borne equally—'*pro rata*'—by all those of my legatees to whom I have made bequests in money, and none others; and in case of the time of such reversion (if such reversion should happen) said land should exceed in value the sum of thirty thousand dollars ($30,000), for which it has been sold, and on which, as before mentioned, 'I have made my calculations, and based my bequests in money, I order and direct such excess or increase, whatever the same may be, to be paid over to the American Bible Society, its proper officers, or their successors, and I hereby give, devise, and bequeath the same, whatever the same may be, to the aforesaid American Bible Society, or its proper officers, or their successors.'

"Item.—Whereas, by the sale of the property to Thomas Woods, Esq., before alluded to, deeds of conveyance will have to be made under the said articles of sale, muniments of title given, and contracts to be fulfilled upon my part, and divers and sundry

matters to be attended to in the premises.  I hereby authorize and empower my executors, hereinafter named, to make such deeds of conveyance, and give such muniments of title in the premises, fulfil all stipulations and contracts into which I may have entered or bound myself, as fully, sufficiently, and entirely, as I myself could have done were I living, my object and intention being that my said executors, hereinafter named, without the necessity of the intervention of the Orphans', or any other court, shall do as I myself could have done, occupying my position, place, or stead, fully, absolutely, and entirely, using their own discretion and judgment, and exercising their own discrimination in executing the various trusts reposed in them by me, in this, my last will and testament."

The Orphans' Court dismissed the petition, whereupon the petitioner applied to this court, and assigned the decree of the court below for error.

*J. W. F. White*, for appellant.—1. The sale applied for was not a matter of favour, but of right under the will.  The widow was entitled to ample support, and it was the duty of the executors to give it to her, and the court below should have compelled them to do so.  The terms of the will authorize a resale.  It is necessary to carry out the intention of the testator, and to prevent litigation, and is desired by all the legatees, except the executors acting as trustees for two children whose father, for himself, and as guardian, *ad litem*, for them, has also assented to it; and the Bible Society, whose opposition is based on an opinion as to the price which it will now bring, in which opinion they stand alone among the legatees.  The intention of the testator is clear, and must govern: Jarman on Wills 414.

2. Where there is power to sell, but no person named, the duty devolves on the executors (Act of February 24th 1834, § 2), who must give security, if required: Houck *v.* Houck, 5 Barr 273.

*John M. Kirkpatrick*, for executors and Bible Society.—1. The will does not authorize a sale until after the death of the widow. She has only a life estate, without any interest in the freehold, and on an application for the sale of the fee, has no standing in court.

2. The testator leaves everything to the discretion and judgment of his executors, and shuts out all interference on the part of the courts.  Exercising this discretion, they oppose the sale.

3. The executors are trustees, under the will, for the legatees, some of whom oppose the sale at this time.

The opinion of the court was delivered, November 22d 1860, by

[McFarland's Appeal.]

THOMPSON, J.—The testator died leaving a widow but no lineal heirs. To his widow he devised all his estate during life, "with entire, absolute, unconditional, and unrestricted control, management, and supervision, to receive all the *proceeds, rents, issues, and profits* of the same, and dispose of them in any manner she may deem proper and right. It being hereby my intention and desire that she shall, during and for her natural life, occupy and be in my position, place, and stead." He then proceeded to make an entire disposition of his estate, after the life estate thus given shall have expired.

It is very evident that his widow was the first object of his bounty, and that he intended ample provision for her during life. This is not only apparent from the will, but the law presumes the first taker of an estate to be the favourite. Whether the widow shall be so, depends on the interpretation to be given to the will. Certainly she will not be so if the appellees are right.

In his lifetime the testator covenanted by articles of agreement to sell sixty acres of land in the vicinity of Pittsburgh, for $30,000, on payments, with interest. On the expectation that this sum would be realized, either from the sale thus made, or from a future sale of the same property, in case it reverted to his estate, as it might and did do, he made this sum the basis of numerous legacies to be paid after the death of his widow, thus giving her the proceeds or interest of the money during life, under the clause in the will already cited. This was all clear in case the land did not revert.

But it did revert during his life, as he had anticipated that by possibility it might. Notwithstanding this, however, he made no change in the disposition of his estate. This was not necessary to effectuate his primary intention. The intention is clearly evinced, we think, that his will should remain exactly the same under the change of circumstances which might occur in regard to the land sold, if we keep in view what he evidently intended, viz. the conversion of the land into money if it should revert, the interest of which to be enjoyed by his widow during life, and the principal after her death to be distributed to the legatees as directed in the will. He also intended a complete disposition of his entire property, for he so declares, and as all other portions of it had been devised and bequeathed subject to the life estate of his widow, so the disposition suggested as being intended by the testator in regard to this particular tract of land, would complete the entire disposition which he was anxious to make.

As already said, the testator anticipated, from the nature of the agreement for the sale of the land, that it might revert to himself or executors. In this event it is plain he intended a sale should take place, so that the fund for his widow and for the legatees should continue to exist, or as nearly so as the price it should

bring might allow. As evidence of this we recur to the will. After saying that the land sold might fall back to himself or executors, he provides that as, "*by the time of such reversion*, the land so sold as aforesaid may have decreased in value," and not be of the value at which he had previously sold it, viz. $30,000, the basis, as he declares, of his calculations in making bequests, the deficits shall be borne equally, *pro rata*, by all those of his legatees "to whom he had given money legacies." When was the value to be ascertained, if the land reverted so as to ascertain whether there would be any deficit or any surplus? The will determined this. It was to be when the land should revert. And it may be said to have reverted to the executors immediately on his death, notwithstanding it had reverted before his death, but was not disposed of by him. It was not necessary, of course, for the purposes of the will, that he should convert the land into money. He had given power to his executors to do that, and this was enough. It therefore reverted to them to be disposed of on his death. It was then to be sold, and then his legatees would know the amount of their legacies, by ascertaining whether there would be any deficit, and the widow would be entitled to the interest of the money. He repeated the same direction in another part of the same clause; wherein he provides that if, at the "time of such reversion," the said land should exceed the sum of $30,000, then the excess should go to the American Bible Society.

The excess, like the deficit, was to be ascertained, and, by the direction to that effect in the will, both were to be ascertained at the time of the "reversion" of the land. This could only be ascertained by a sale; no appraisement could effect that object; and we think the will cannot be executed without a sale.

The direction by the testator to his executors, that, if they should have to make deeds to Mr. Woods, they should have power to do so without being under any necessity of applying to court, but that they should exercise their own discretion on the subject; and also in regard to the special trusts reposed in them, has been mistakenly supposed to indicate an intention that no sale was to be made, excepting at their discretion, and hence none might be ordered by the court. If it had been a matter of discretion, still an unreasonable exercise of it could be corrected by the supervisory power of the court. But the testator did not mean what is here supposed. His direction refers to the conveyances which he anticipated might be required to be made to the purchaser from himself, and then they were to make deeds without being put to the trouble and expense of proving the contract, and asking leave to make them. This was what he meant. As trustees also, he gave the executors discretionary power in the same clause. But these provisions do not touch the case of a sale of

1 Wr.—20

[McFarland's Appeal.]

this land after it should revert. There is a general authority to sell it without expressly naming the executors; and as there has been some controversy as to their right to do so, and as they are trustees for legatees interested in the sale, we think it a proper case for an order for sale by the Orphans' Court, under the 12th section of the Act of 24th February 1834, and for its control in regard to the investment of the purchase-money in such a manner as to carry out the provisions of the will as we have found them to be.

The idea that a sale was to be postponed until after the death of the widow, as contended for by the appellees, is not to be found in the will. The clause cited to sustain this view I think proves the opposite. It is as follows: "after the death of my beloved wife, Catharine McFarland, it is my will and desire that all my property and estate, real, personal, and mixed, shall be disposed of, *and I do dispose of it as follows,* &c." The disposition he makes is to turn the realty into money, the principal to be paid after her death. There is nothing like an intention that the land should remain until after that event, and I cannot see how any such idea could have been drawn from it.

All parties in interest, excepting the American Bible Society, and the executors, desire the sale. The latter have no interest in the subject-matter but as executors and trustees; and the former but a residuary interest. And we cannot allow this expectancy to defeat a provision by the testator for his widow, in order to enhance the chances of increasing that residuary interest in a future sale. The decree of the Orphans' Court must be reversed, at the costs of the appellees.

DECREE.—November 22d 1860. This cause having come on for hearing on the appeal of Catharine McFarland from the decree of the Orphans' Court of Allegheny county, and having been argued by counsel, and duly considered by this court, it is ordered and decreed that the said decree of the Orphans' Court, dismissing the petition of the said Catharine, be reversed, and it is now here further ordered and decreed, that the executors of Joseph McFarland, deceased, proceed to sell, within one year from this date, on such terms of payment as shall be approved or directed by the said Orphans' Court, the tract of land described in the said petition, and make and deliver proper conveyances therefor, on the payment of the purchase-money, or on obtaining proper security therefor by bonds secured by mortgage or mortgages on the land sold, and securely invest the said purchase-money, as the same shall be received, for the benefit of the said Catharine McFar-

[McFarland's Appeal.]

land during her life, and afterwards distribute the same to the legatees appointed by the will to receive it. And the cause is now remanded to the said Orphans' Court, that this decree may there be carried into effect, the costs to be paid by the appellees.