## Waddell's Estate.

*Executors and administrators—Surcharge—Error of judgment.*

An executor will not be surcharged for a loss that occurs through a mere error of judgment.

*Executors and administrators—Discretion as to sale of real estate.*

A discretionary power in executors to sell real estate cannot be controlled by a demand of one or more of the legatees for an immediate sale.  Nothing less than the request of all the legatees will save the executors from the peril of a nonexercise of their own judgment, and this only because the legatees would be estopped from denying the good faith of the executors.

*Executors and administrators—Power to sell coal land—Discretion.*

An experienced owner and operator of coal land began to open a shaft, and at the time he made a codicil to his will, had struck a fault, which he knew would cost a large sum of money to overcome.  By the codicil he directed as follows: "My executors shall sell and convert all my interest in any of my collieries or coal operations, wherever situated, as soon as the same can conveniently be done with advantage to my estate, and until such sale of said colliery interests my executors shall conduct the same and all the business operations connected therewith for the benefit of my estate, with the same power and effect as if I were living, and managing or conducting the same."  The executors prosecuted the work through the fault at an expense which largely exceeded the receipts.  There was no evidence of fraud on the part of the executors.  *Held*, that the executors should not be surcharged with the loss.

Argued April 10, 1900.  Appeal, No. 20, Jan. T., 1900, by

W. L. Watson et al., executors, from decree of O. C. Luzerne County, No. 398 of 1894, sustaining exceptions to account, in estate of Thomas Waddell, deceased.   Before GREEN, C. J., McCOLLUM, MITCHELL, DEAN and FELL, JJ.   Reversed.

Exceptions to account.

The facts are fully stated in the opinion of the Supreme Court.

The court sustained exceptions to the account, and surcharged the executors with $36,662.25.

*Error assigned* was the decree of the court.

*George S. Ferris* and *Henry W. Palmer*, for appellants.—In pursuance of the testator's explicit directions, the executors operated the colliery, pending sale thereof, in a workmanlike manner, and did with the property, in all respects, what a prudent man would do with his own under like circumstances.

It is the will of the testator and not the will of even a majority of the legatees that should govern the action of executors.   The minority would still have a right to demand that the executors carry out the will on pain of surcharge if loss followed their failure to do so.

The measure of a trustee's duty in the management of the trust estate is good faith and the exercise of common skill, prudence and caution: Bartol's App., 182 Pa. 407; Webb's App., 165 Pa. 330; Neff's App., 57 Pa. 91; Semple's Est., 189 Pa. 388.

He will not be surcharged with the amount of a loss arising from a mere error of judgment: Lancaster's Est., 18 Phila. 10; Naglee's Est., 52 Pa. 154; Old's Est., 176 Pa. 150; Pleasonton's App., 99 Pa. 362; Williams's App., 73 Pa. 249; Getz's Est., 12 Phila. 143; Stewart's Est., 110 Pa. 425; Dillebaugh's Est., 4 Watts, 177; Bartol's App., 182 Pa. 407; Knight v. Lord Plimouth, 3 Atkyn, 480; Semple's Est., 189 Pa. 388; Springer's Est., 51 Pa. 342; Rowth v. Howell, 3 Ves. 565; Calhoun's Est., 6 Watts, 185; Webb's Est., 165 Pa. 330; Doyle's Est., 2 Del. Co. Rep. 196; B. & O. R. R. Co. v. Schwindling, 101 Pa. 258; Kentucky Central R. R. Co. v. Gastineau, 83 Ky. 119.

There was no negligence in the mere fact that the executors

conducted operations until a sale of the colliery was arranged. As to this they had no discretion: Dillebaugh's Est., 4 Watts, 177; Doyle's Est., 2 Del. Co. Rep. 196; Weigand's App., 28 Pa. 471; Naglee's Est., 52 Pa. 154; Pulpress v. African M. E. Church, 48 Pa. 204; Perry on Trusts, 511; Hill on Trustees, *488; Williams's App., 73 Pa. 249.

It would have been idle for the executors to apply to the orphans' court for directions as to how they should run the colliery, and their failure to do so is no evidence of negligence: Act of May 19, 1874, P. L. 207; Lafferty's Est., 3 Pa. Dist. Rep. 453; Odd Fellows Savings Bank's App., 123 Pa. 356; Old's Est., 176 Pa. 150.

A trustee is not required to be infallible in his judgment, nor to possess the power of anticipating events not generally looked for: Cridland's Est., 132 Pa. 479; Old's Est., 176 Pa. 150; Jack's App., 94 Pa. 367; Williams v. LeBar, 141 Pa. 149.

*D. L. Rhone* and *J. Q. Creveling*, for appellees.—A sale was a primary object of the testator.

Mere waiting in the delusive hope of a rise in price and better conditions of the coal market is a speculation of the rankest sort, and no executor or trustee, especially he who sees all properties about him constantly decreasing in value, is justified in delaying to sell where the will imperatively demands a conversion: Merkel's Est., 131 Pa. 584; Leslie's App., 63 Pa. 355; Chambersburg Savings Fund Assn.'s App., 76 Pa. 230.

Without express authority conferred by the will, a trustee may not embark the general assets of the estate in a business authorized to be continued: Burwell v. Cawood, 2 How. (U. S.) 560; Wilcox v. Derickson, 168 Pa. 331; McArdle v. West Phila. Title & Trust Company, 7 Pa. Superior Ct. 328; Shinn's Est., 166 Pa. 121; Ex parte Richardson, 3 Maddock, 138.

The executors were not authorized by the will nor the law to spend any of the general assets in the mining operations: Mc-Neillie v. Acton, 4 De G. M. & G. 744–749; Smith v. Ayer, 101 U. S. 320; Burwell v. Mandevill, 2 How. 560; Ex parte Garland, 10 Vesey, 110; Wilcox v. Derickson, 168 Pa. 331; Mc-Ardle v. West Phila. Title & Trust Co., 7 Pa. Superior Ct. 328; Ferry v. Laible, 32 N. J. Eq. 791.

OPINION BY MR. JUSTICE DEAN, May 23, 1900:

Thomas Waddell, a coal operator of Luzerne county, died on October 23, 1894, leaving a will with three codicils, the last one dated only nineteen days before his death. He was conducting several coal plants just before he died, among others, a newly opened mine at Winton. In this last he had sunk a slope to the coal, and also a shaft, for what under the statute is known as the second opening, but had made no connection between them; the slope had reached the coal, but at the bottom had struck a fault, which barred access to the regular and valuable bed beyond it. To utilize the shaft and slope already put down at great cost, development of the property required that the operator should cut through the fault, or abandon the operation at that point and try another. This was well known to testator, and with this knowledge, and with his will before him, a few days before his death, when he executed the last codicil, he leaves this provision in full force:

"My executors shall sell and convert all my interest in any of my collieries or coal operations, wherever situated, as soon as the same can conveniently be done with advantage to my estate, and until such sale of said colliery interests my executors shall conduct the same and all the business operations connected therewith for the benefit of my estate, with the same power and effect as if I were living, and managing or conducting the same."

The executors wanted to get a purchaser for the Winton mine, and proceeded to make the connection between the shaft and slope, to cut through the fault, and put the mine in a workable condition, on the assumption that it would sell for a higher price if ready for working. Some coal was sold during the progress of the work, but not nearly in quantity to equal the expenditure, in royalties paid, and in rock blasting and labor necessary to cut through the fault. On February 15, 1897, the colliery was sold for $30,000. On August 30, 1897, the executors filed their first partial account. From this account, as found by the court below, the executors had expended, including interest and royalty, $36,622.25 more than they had received for coal mined, dating their answerability for thirty-two months from the end of a period of six months after decedent's death. Many exceptions were filed by Bar-

bara W. Gangloff and Ellen W. Bryden, two of the legatees
and daughters of testator. The second exception substan-
tially raises all that is in issue here between the legatees and
executors. The rulings of the court below on the other ex-
ceptions are sustained. The second was ruled in favor of
the legatees, and the executors surcharged with the $36,622.25.
From that decree they appeal to this court, averring it to be
error.

We have already quoted the clause of the will relating to
the sale of the collieries. 1. What was the executors' duty?
2. What was the scope of their discretion in the exercise of it?
Their duty was imperative, to sell the property; not immedi-
ately, however, but when the same " can be conveniently done
with advantage to my estate." These words absolutely nega-
tive a peremptory direction to sell immediately. They at once
imposed upon the executors the exercise of discretion and
judgment as to when such sale could be made with advantage
to the estate. To what line did this discretion as to time of
sale extend? The exceptants argue that the duty was to be
exercised by at once, at least, offering it for sale. The execu-
tors might have done so, if, in their judgment, that would have
been of advantage to the estate; but they dared not so to do,
if, in their judgment, it would be a disadvantage. The learned
judge of the court below holds that they ought to have sold
at the end of six months, and therefore surcharges them with
all excess of expenditures over receipts after the expiration of
that period. As concerns the will, the one conclusion is as
arbitrary as the other; the testator fixed no date whatever,
except the judgment of the executors; that is, when, in their
opinion, it would be of advantage to his estate. Unless the
facts show a gross abuse of discretion or gross supineness or
negligence in its exercise, their judgment must control.

By the words of the will the testator expresses the utmost
confidence in the executors' capacity. As we have before no-
ticed, he had run this slope about to the fault, and had sunk
the shaft for the second opening; the evidence shows that this
work had been done at a large cost by testator himself; but it
did not prove the value of the mine; that could only be demon-
strated by piercing the fault to the undisturbed coal beyond it.
This condition, at once, imposed on the executors the exercise

of judgment as to when the sale should be made. Shall we prosecute the work commenced by the testator? Shall we sell the property now or after its development? There was absolutely nothing then making certain which course would be of most advantage to the estate. It was solely a matter of opinion; that this is so is demonstrated by the evidence; experienced coal operators whose credibility is not questioned, widely differed; some would have bought "a pig in a poke," and have taken chances on the speculation; others would have preferred to know exactly what they were buying, even with the consequence of paying more. Under such circumstances, the executors undertook to prosecute the work through the fault, and also to connect the two openings. It is probable, if they had known, then, that the expense would so largely exceed the receipts, they would have made an immediate sale; but this, neither they nor others could tell; the extent and character of the fault could only be determined by the use of muscle, pick and blasting powder. The event demonstrated that the expenditure was not warranted; that the testator himself had made a mistake in locating the slope. The court below says: "The decedent was a practical miner, and had accumulated a large fortune in that business. At his death the Winton was not open to the capacity of the breaker; large amounts of money had been expended without return, and he must have known when he authorized the executors to continue mining, pending a sale, that still other large amounts might be needed to carry out his directions. . . . Decedent was a clear-headed, determined man of business ability, but he had no doubt made a great mistake in locating the slope at the Winton colliery." Here was a highly competent judge, who was not only of the opinion that the slope was properly located, but who, by the plainest implication, directed his executors to continue it, at the expense of his estate, until a sale advantageous to his estate could be made. Whatever mistake there was, was his mistake. Yet the effect of the decree is to surcharge accountants with the loss consequent upon the mistake of the testator. It plainly appears that the executors, in the exercise of an honest judgment, believed the mine would sell for a largely increased price if the slope was extended to the large area of coal beyond the fault; the cost greatly exceeded any enchanced price received

at the sale.  Why should they be held personally responsible?
Not a single authority is cited, not one can be found, which
imposes such a penalty as this surcharge, for a mere error of
judgment; had the testator lived, his loss would have been the
same from his own error of judgment; his legatees cannot make
the estate whole, by saddling the loss on the accountants.  The
authorities are so numerous and uniform on this question, that
an executor will not be surcharged for a loss that occurs through
a mere error of judgment, that we will not undertake to cite
them; they number at least fifty, from Dillebaugh's Estate, 4
Watts, 177, down to Semple's Estate, 189 Pa. 385.  The author-
ities cited by the court below do not sustain its decree.  Mc-
Farland's App., 37 Pa. 300, rules that an unreasonable exercise
of discretion by an executor can be restrained by the courts.
The facts, as found by the court here, show that at the time
the money was being expended, the executors were, with the
light they had, or that they could procure, exercising a reason-
able discretion; they had not the use of something similar to
X rays, which would enable them to see into the ground and
determine the extent and almost impenetrable nature of this
fault.  Mussleman's Appeal, 65 Pa. 480, is to the same effect.
It rules, that if the power to sell be conferred on the executor,
the orphans' court has jurisdiction to control its exercise.  These
rulings do not touch this case.  Shall we sell or dig, was the
question that presented itself to these executors; they honestly
believed it would be of more advantage to the estate to defer
a sale until after digging through the fault.  We doubt, if the
orphans' court could, at that time, have seen further into that
ground than the executors, or would have, under the circum-
stances, been more capable of exercising a sound discretion
than they.  The authorities cited by the learned counsel for
appellee, Leslie's Appeal, 63 Pa. 355, Chambersburg Saving
Fund Assn.'s Appeal, 76 Pa. 230, and Moore's Appeal, 10 Pa.
438, are cases where the executors or trustees were guilty of
supine negligence or indifference.  Burwell v. Cawood, 2 How.
(U. S.) 560, and Wilcox v. Derickson, 168 Pa. 331, hold that a
provision in a will directing a particular business to be continued,
does not subject the general assets to appropriation in carrying it
on.  The direction here was for the conversion of all the inter-
ests of all his coal operations as soon as the same could be done

with advantage to his estate, "with the same power and effect as if I were living and managing or conducting the same." It would be impossible to make the authority of the executors to use the whole or any part of the assets, in prosecuting this work, broader than these sweeping words make it. Shinn's Estate, 166 Pa. 121, holds that the executor has no authority in the absence of express directions in the will to embark the assets of the estate in a venturesome business. Here, there was not, in any proper sense, investment in a venturesome business, and if there were, it was by express authority of testator. And so with the other authorities cited; they do not fit these facts and this will.

It is argued that as a minority of the legatees requested, that the expense be stopped and the property be sold, the executors were bound to sell; this, as a fact, is not clear; there is no doubt but that two out of the seven complained and said it ought to be sold; Watson, one of the executors, testifies that at a meeting of the legatees and executors, he said the property was theirs, and anything they thought best would be done, and he proposed to have an agreement to that effect signed by all, which was not done; but assume that a minority, or even a majority, had in writing requested an immediate sale, that would have been no protection to the executors against those who did not join. It was the discretion of the executors which under the will was to be exercised, not that of the legatees; nothing less than the request of all would have saved the executors from the peril of a nonexercise of their own judgment, and this, only because there were no creditors, and the legatees, being the only parties in interest, would then have been estopped from denying the good faith of the executors. There is nothing of significance in this point.

As to the fact urged that George W. Waddell claimed the Winton mine, and therefore, not in the interests of the estate, but in his own, wanted it developed, there is no evidence to prove it. The will did not give him the property; his conduct shows no evidence of a selfish purpose; on the contrary, he acted in harmony with his coexecutors, and at a loss to himself pro rata with the other legatees. The language of Cline's Appeal, 106 Pa. 617, is pertinent to these facts:

" The testator in directing his business to be carried on may

have thought he was acting wisely in so doing. As a general rule such provisions in wills result disastrously, and this case is not an exception to the rule. It has certainly impaired the estate. But we must be careful not to throw the consequence of the 'testator's folly' upon the executor. If it (the carrying on of the business) resulted in a gain, the estate would have the benefit of it; if in a loss such loss must fall on the estate. It would be a hard rule to put the losses on one who had no possible participation in the profits."

The decree is reversed, and it is directed that the surcharge of $36,622.25 against accountants be striken off, and that the account as reformed be confirmed absolutely; costs to be paid by appellees.