APPEL, J.,
— Objections to the account which have been filed by some of the legatees are before us for disposition. The main thrust of the *738 objections is to surcharge the executor. The attempted surcharge is based on the rejection of a bid in the sum of $6,600 at a public sale of decedent’s residence shortly after her death and an eventual sale of the premises more than two years later for $500.
Ida B. Denlinger died February 2,1968. At her death, she was the owner and occupant of 768 South Franklin Street, Lancaster, Pa. On February 5th, letters testamentary were granted to her son, Clayton Denlinger.
Prior to March 2nd, arrangements were made with Roland M. Jermyn, an experienced and well-considered realtor and appraiser in the community, to inspect the property and to give somé indication of its value. By letter dated March 12th, Mr. Jermyn mentioned a figure or. estimate of $7,500, as the value of the property.
On April 6th, the property was offered at an advertised public sale. When the bidding reached the sum of $6,600, there was a recess. During the recess, the executor, his attorney, Edgar R. Barnes, Jr., and the auctioneer, Claude F. Smith, discussed the bid. In addition, Mr. Barnes talked to some of the legatees, being five or six of the 10 other living children. He testified that those to whom he talked indicated that they thought the property was worth considerably more than the sum which had been bid. He also said that one of them had mentioned the possibility of a person interested in acquiring the property for $9,600. Mr. Barnes felt that there was a “consensus” of those present that the offer was too low. In addition, the executor testified that two realtors who were at the sale had suggested that they could produce a better price.
The executor, in consultation with his attorney, considered the information at hand and decided to withdraw the property. Subsequent events have fully *739 established that this was a most unfortunate and disastrous mistake of judgment.
The executor thereafter pursued a variety of efforts to sell the property. He first attempted to sell it on his own. He then had a realtor named Hartman down to inspect the premises. In May, the executor entered an agreement of sale providing for a purchase price of $8,000, subject to the purchaser obtaining an FHA mortgage. It was estimated that upon consummation the estate would net approximately $7,000. The hopes thus engendered were dispelled by the refusal of the necessary FHA loan commitment. This agreement expired June 25th and thereafter the executor again tried to sell the property himself. He conferred with the auctioneer and then contacted possible prospects suggested by the auctioneer. In December he listed the premises with a realtor, Plank, for a six months’ period.
By order dated May 15,1969, the Chief of Inspection of the City of Lancaster designated the property as “unfit for human habitation.” The notice of unfitness contains a list of approximately 25 different repairs, alterations, improvements or changes required to remedy the factors which constituted the dwelling as a “serious hazard to the health or safety of the occupants or to the public.” They range from conditions existing at decedent’s death, such as connecting to an approved water system and approved sewerage system, to conditions not existing at her death, such as replacement of broken window panes and repair of window sashes. Between these types of conditions are those whose time of inception is indeterminable. An example of the latter group is the requirement that, “All windows, exterior doors, basement or cellar doors (hatchway) shall be weathertight, watertight, rodent-proof and kept in good condition and repair.” At least *740 one of the remedies was dictated pursuant to an ordinance adopted February 11, 1969, more than a year after Mrs. Denlinger s death.
On July 31, 1969, the Insurance Placement Facility of Pennsylvania issued a rate notification concerning the property on which it is stated:
“Vacant must be completely boarded on all floors due to evidence of vandalism and prevent access by unauthorized persons.
“This facility can issue your insurance providing you correct the above condition . .
On October 21st after the building had been boarded up, the facility issued its rate notification agreeing to insure for the sum of $10,000, for a yearly premium of $823.
At some time prior to August 15, 1969, the property was again offered at public sale. At this sale, no bids were made.
The personal representative testified that he continued to attempt to sell the property during the fall and winter of 1969-70 and finally in July 1970, 27 months after rejecting the bid of $6,600, he executed an agreement providing for a purchase price of $500. This agreement was consummated and the accounting thereof has resulted in the objections now before the court.
Everyone involved recognizes that at the time of decedent’s death the premises were without city water and sewer and that there were no curbs and sidewalks. The condition of the property otherwise is in some dispute, although it is apparent that it provided a home for decedent for many years prior to her death at the age of 85. There is testimony that the property was vandalized from time to time after her death and prior to the ultimate sale. It appears that none of the damage from vandalism had occurred prior to the *741 first public sale. The testimony concerning its condition at the time of her death is of little significance. The important fact is that on April 6th there was a bid of $6,600. Subsequently, the property was sold for $500.
We are unable to determine that any of the legatees are barred from asserting a surcharge because of the discussions at the sale with the attorney. None of them have been identified with sufficient particularity to permit a conclusion of participation or acquiescence in the executor’s decision not to sell. Some of the legatees mentioned sums substantially in excess of the amount bid at the public sale. Since the sale had been advertised, it appears that the executor would not have been exposed to a surcharge had he accepted the $6,600 offer even though the consensus was that the bid should be refused. Apparently, the executor took into consideration the report of his attorney concerning his discussions with the other legatees, the sums mentioned by them, the estimate of Mr. Jermyn, the suggestions of the realtors present at the sale and other information and factors. Based on his evaluation of all of these matters he decided to reject the bid. Although the testimony is not sufficient to deprive the children individually of the right to attempt to surcharge, it is nevertheless persuasive concerning the reasonableness of the executor’s conclusion.
In Nemon’s Est., 301 Pa. 425, a hotel for which an offer of $18,000 had been made was subsequently sold for $4,400. In denying a surcharge in a per curiam opinion the court said:
“In Semple’s Appeal, 189 Pa. 385,390, quoting Neff’s Appeal, 57 Pa. 91, this court said, ‘executors, administrators or guardians are not liable beyond what they actually receive unless in case of gross negligence, for when they act as others do with their own goods, in good faith, and they are not guilty of gross negligence, *742 they are not liable/ and in Waddell’s Estate, 196 Pa. 294, 300, we said not a single authority is cited, not one can be found which imposes such a penalty as this surcharge, for mere error of judgment.’ Many other decisions of this court to the same effect might be cited. Here the testimony shows the executors acted with common prudence and common caution and fails to establish negligence or bad faith; at most their failure to dispose of the hotel when first acquired by them was merely an error of judgment for which they are not chargeable.”
In Keller’s Appeal, 8 Pa. 288, at pages 289-290, Judge Coulter said:
“It must be borne in mind that the office of administrator, executor, and guardian, is one of the highest and most absolute necessity in society; and in a great majority of cases is undertaken more out of kindness and duty, than with any hope or expectation of emolument, and is attended in its faithful discharge with trouble, anxiety and hazard.
“In the case of Knight v. Earl of Plymouth, 3 Atk. 480, Lord Hardwick observes: ‘If there is nothing wilful in the conduct of the trustee, no mala fides, the court will always favour him. To subject him to losses which he could not foresee, would be manifest hardship, and would be deterring every one from accepting such an office.’ ”
In Cope’s Estate (No. 1), 50 D. & C. 189, the trustee declined an offer of $4,500 for a property which was eventually sold for $1,500. The Orphans’ Court of Philadelphia refused to surcharge under the circumstances.
After refusing the bid of $6,600, the accountant entered into an agreement to sell at a price which would have produced a net of $7,000 to the estate. The logic which prompted his conclusion to turn down the public *743 sale offer was within an FHA commitment of being justified. Unfortunately, the commitment never arrived.
Under the circumstances, we are unable to find that the executor could have anticipated the acts of vandalism and the consequent injury and deterioration which contributed to the tremendous decline in price.
The testimony of Sidney Peters, husband of one of the objectors, paints a tragic picture of the steady destructive, wide-ranging effect of some of the continuing acts of vandalism to which this property was subjected as follows:
“A. Well, it went down and down and down; we sometimes, my wife and I, went out for a drive and we would deliberately go down this way and each time we noticed a few more palings out of the banister and the rock wall in the front had fallen down and on one occasion we went in the house; it looked, and this is opinion, like somebody held a party in there, there were bottles, liquor bottles lying around in the kitchen, the kitchen floor was a mess, an unsanitary mess and the kitchen ceiling which had been in pretty good shape, was or had been water soaked, I couldn’t tell of course, whether it was dry and the shower which was put up just shortly before Mrs. Denlinger’s death, was badly damaged.”
We are unable to conclude that the executor was grossly negligent in rejecting the bid. There has been no testimony indicating that he acted in bad faith. Events subsequent to the public sale fully establish that the rejection of the bid was an extremely poor exercise of judgment; however, these events do not, in our opinion, establish gross negligence. When his decision was made, it was based on a reasonable consideration of those factors which an individual should take into consideration in arriving at a decision thereon. The following from the opinion of Mr. Justice Maxey *744 in Shipley’s Estate (No. 1), 337 Pa. 571, at page 577, is particularly pertinent to the present case:
“There is no rule of law which requires that an executor’s foresight must measure up to the standard of a legatee’s hindsight.”
We, therefore, conclude that the exceptions should be dismissed. Our formal dismissal is included in the adjudication which is being filed simultaneously herewith.