Letters testamentary in this estate were granted September 4, 1871, to the accountant, who, on the 14th of December, 1872, filed an account of his administration to July 26, 1872. This account was referred by the former Orphans' Court to the auditor, who, within a proper time, completed his report, and gave notice that it would be filed October 16, 1873. At the request of counsel, by whom it was supposed an amicable adjustment of certain matters in dispute might be made — the parties being very near relatives — the filing of the report was delayed until March 2, 1878, the argument before the auditor upon the exceptions presented, not having taken place until December 28, 1877.
A considerable part of the estate consisted of canal stocks, turnpike stocks, etc., which were not legal investments. They were, however, investments made by the testator himself, and in the soundness of which, it is said, he had much confidence. The executor, to whom the whole estate, real and personal, had been given to hold in trust for the purposes of the will, and who was the testator's son; had, in the exercise of his *Page 427 
judgment, thought it better not to dispose of those stocks which at that time were yielding an income; and he had, at the same time, paid interest on certain indeptedness of the testator, instead of paying off the principal.
It does not appear whether, at the time the account was before the auditor, these stocks had depreciated or not, though since then, it is said, they have done so to a very large extent. But the auditor was asked, by counsedl for exceptants, to sur- charge teh accountant with the then value of the stocks as so much cash, on the ground that they were not legal investments and should have been disposed of within the year after testator's death. The auditor diclined to do this, as he did also to grant the request that he would order a sale to be made, and the grant the request that he would order a sale to be made, and the proceeds brought into the account; as to which, he was of opinion that he had no authority.
The first exception relates to this refusal on the part of the auditor.
The rule with regard to the duty of a trustee, into whose hands investments made by the testator himself may come, differs very greatly from that which governs him in making his own investments. In the latter case he becomes liable if he deviates from the line marked out by the law, should a loss arise. In the former case much is left to the discretion of the trustee, and if in the honest and proper exercise of that discretion, he delays the realization, he may not be held liable for any loss arising form such delay; see Hill on Trustees, *380; Barton's Estate, 1 Parsond, 24. It is true that is has been said that Barton's Estate has been overruled by Pray's Appeal, 10 Casey, 100; but it will be found that the point decided in the latter case was as to an investment by the trustees themselves, which was also the case in Hemphill's Appeal, 6 harris, 303, and Worrell's Appeal, 11 Harris, 44.
In discretion of the accountant in this respent was not exhausted when he filed his account. If he supposed that the *Page 428 
interest of the estate would be promoted by a still longer delay, it was for him, and not the auditor, to decide upon the point, leaving to the settlement of future accounts the question whether the discretion had been properly exercised. It is not pretended that he had not acted in good faith, nor is it even asserted that at that time any depreciation had taken place.
We think the first exception must be overruled.
A very different question will arise when the account, subsequent to the period of the present account shall be filed, if it should appear that, notwithstanding the request of exceptants, there was a long-continued refusal to sell, and a consequent loss. Upon this, however, we express no present opinion.
Another exception was to the action of the auditor, in refusing to disallow the credits for interest upon certain indebtedness, which it was said would not have accrued if the accountant had converted the securities already referred to and paid off the principal. The auditor's report shows that the principal could not have been then paid because the debts were due to estates of which the testator had been trustee, and as to which he had directed that his executors should continue to act as trustee until a successor should be legally appointed. Besides this, the securities were at that time producing an income for the estate quite as large, if not considerably larger, than the amount of interest paid out; so that, in this respect, irrespective of the question of depreciation, the estate was the gainer, rather than the loser, by the failure to convert.
This exception is overruled.
The will of the testator gave the estate to the executor "in trust, to manage the whole thereof carefully, so as to preserve and keep the same productive; and to collect, get in and receive the income of the several portions as the same shall accrue, and after deducting thereout all taxes, cost of repairs of real estate, and necessary expenses of executing the trust, which shall include a commission of five per cent. to himself for his trouble, care and integrity therein, the clear net income to *Page 429 
pay in half-yearly payments, one equal fifth to his wife, and one equal fifth to each of his four children — the accountant being one — during the life of the wife, with a provision that the amount so to be paid to the wife should never be less than $2,000 per annum." The payments to the daughters, all of whom were married, were to be for their separate use. At the death of his wife, the executor was directed "to continue the management aforesaid, for the benefit of the four children; and so distribute and pay the whole net income * * * as that each shall receive an equal fourth part thereof * * * during his or her respective natural life. And upon the decease of either one of my said children, and successively of each of them, then, as respects one equal fourth part of the corpus or principal of my residuary estate, to and for the only proper use of his or her child, or all of his or her children; if more than one, who shall have attained or shall attain the age of twenty-one years, and the issue of any such who shall havedied, or who shall die under that age, leaving issue." * * * "But if either of my said children shall die without leaving a child or issue of a deceased child, him or her surviving them, as respects the share `so limited,' I will and direct it shall be held for the equal use and benefit of my other children and their respective issue, upon and subject to the same trust." etc.
This provision, so far as concerns the grandchildren, was altered by a codicil, which directed that "the principal proceeds of all the residue * * * shall be reserved and preserved for all my grandchildren in equal shares per capita; and, therefore, I will and direct that when, according to the limitations and provisions of my said will, any one, and successively as each of my grandchildren shall become entitled to receive his or her equal portion of my estate, the same shall be determined and limited by the quotient of the whole reserved principal divided by the whole number of my grandchildren then living and the issue of such of them as shall have previously died leaving issue," such issue taking per stirpes * * * "And, also, if after any one or more of my grandchildren shall have received his or her or their respective proportion," * * * "one or more of them shall die *Page 430 
without issue surviving," * * * "such portion of my estate" * * * "shall go and be payable in equal shares to all the others of my grandchildren living, and the issue of any of them as shall be then dead, at the time in and by my said will specified and limited."
The auditor was asked to divide the estate into five equal parts "so that the share of each cestui que trust might be ascertained and set apart." He was also asked to decide that the limitations to the grandchildren were void as offending against the law with regard to perpetuities. The latter he declined doing, on the ground that the questions before him only related to the distribution of income, and that he had nothing to do with the ultimate disposition of the principal. He declined, also, to make the division asked for.
It is now conceded that the division could not have been made at that time, because, during the life of the widow, it was necessary, in order to secure to her the payment of the full amount, which, under any circumstances, she was to receive, that the whole principal should remain in the custody of the trustee for that purpose. It is said, however, that the widow has since died; but this was not until long after the report had been prepared, and after the functions of the auditor, except for the purpose of reviewing what he had already done, had ceased. It certainly was not error when the point was decided by him. Whether or not a division should be made since the death of the widow can be decided when the final account of the executor is filed, when it will be determined how, the administration being closed, he shall hold it as trustee.
Does the limitation to the grandchildren violate the rule with regard to perpetuities?
At the death of each child a proportionate part of the corpus
of the estate is to vest in such of the grandchildren as shallthen have attained the age of twenty-five years, and the issue of such as shall have died leaving issue, and in such grandchild as shall thereafter attain the age of twenty-five years. So far as concerns the latter, the validity of the gift, to them will depend on the contingency of whether they shall attain the *Page 431 
required age within twenty-one years of the death of the child whose share is to be divided. If they will not, the limitation to this extent will fail, and there will be pro tanto an intestacy. Whether this will be so or not cannot be determined until the period arrives upon which the question depends, namely, the death of each child. There is a provision for the death of a grandchild in whom an interest has been invested, which, no doubt, is invalid, but this does not affect the present question.
The third, fourth and fifth exceptions are overruled.
We must also overrule the sixth exception. The auditor, we think, has nothing to do with the question of the fall in price of stock, since his report was made in 1873. Had he then filed his report this would be very clear. That it was retained by counsel, and not filed, does not change the result; his functions were ended when he passed upon the account as it then was.
If a loss for which the accountant is responsible has taken place in the interval, that can be settled when his account for that period shall be filed.
We do not see, so far as the present account is concerned, that anything has been done to deprive the accountant of his commissions, and his good faith has not been questioned.
Exceptions dismissed, and the report of the auditor confirmed.
The following is an extract from the adjudication upon the second account filed by said Passmore Williamson:
The decedent died August 26, 1871, having first made his last will and testament, with a codicil attached, both duly proved September 1, 1871, by which, after bequeathing certain pecuniary and specific legacies he devised and bequeathed all the rest, residue and remainder of his estate unto his son, Passmore Williamson, the accountant in trust, "to manage the whole thereof carefully, so as to preserve and keep the same productive of income," and after deducting all taxes, repairs of real estate and expenses of the trust, including a *Page 432 
commission of five per cent. for his "care, trouble and integrity," to pay over the net income, half-yearly, as follows:
One-fifth part to testator's wife; one-fifth part to each of his daughters, Phoebe, W. Eldridge, Anna W. Stackhouse, and Mary W. Coggins; and the other fifth part to retain for his own use.
The widow of testator died July 2, 1876, so that the income of the trust estate is now payable in four equal shares to his above-named children, all of whom are still surviving.
The annexed account is the second filed by the executor and trustee, and was carefully and critically examined and found to be entirely correct.
Mr. Miller, however, on behalf of the cestui que trust
represented by him, claimed to surcharge the accountant with the market price of the securities in the hands of the accountant, known and termed "illegal investments," at the time when the demand was made before the auditor appointed to audit the first account of the executor and trustee, that such investments should be directed to be sold, the interval between the death of the testator and that period having been a reasonable time for the conversion of said securities; and such a demand, coupled with the fact of the existence of large debts of the testator unpaid, being a reason why the executor should no longer have delayed a conversion.
Mr. Miller further claims that the accountant should be surcharged, on the basis of having immediately invested the market prices of such securities at that time in legal investments at the prices of that date.
And, in addition, claimed that accountant should be disallowed all commissions.
The annexed account is both a principal and "income" account.
The first account filed was in the same form, and no "commissions" upon the principal of the estate were therein claimed.
The executor apparently delayed his claims for commission *Page 433 
until the filing of subsequent accounts, for in that annexed he claims credit under date of:
1872, 8 mo., 30, by commissions on $44,788 27 capital disbursed 5 per cent., 2,238 91 1876, " by commissions on 40,185 39 capital disbursed, 2,009 27
This may be convenient for the accountant, but it was not the proper form to charge commissions.
Commissions are not allowed on "disbursements," but on "receipts." And particularly, as in this case, where the executor is also trustee, and under the Act of Assembly is allowed but a single commission on the principal of the estate, the correct mode of deducting the compensation of the executor is to charge the same against the principal of the estate in his account as executor, whereby the balance to be held as trustee will be accurately ascertained and so awarded. This balance then forms the corpus of the trust, the income of which only is subject to any abatement for commissions allowed.
As to the claim to surcharge accountant.
It appeared from the evidence presented that testasor and his son, the accountant, had been in business together for many years in this city, and the latter was fully conversant with the affairs of his father, and familiar with the nature and character of the investments made by him from time to time.
Upon the death of the testator his personal estate consisted largely of investments in Schuylkill Navigation Company, Lehigh Coal and Navigation Company, Lehigh Valley Railroad Company, Bank. Turnpike and Safe Deposit Company's stocks, all of which had been in his life-time profitable dividends and which came into the hands of accountant as his executor.
They continued to pay large dividends after the death of testator and were not immediately sold by the accountant, for the reason that being largely interested in the estate himself, he believed it for the benefit and advantage of all the cestuis quatrust to retain the investments, as they were realizing a *Page 434 
greater income than would have been derived from securities authorized by Act of Assembly.
The testator in his life-time had acted in a number of instances as executor, administrator, trustee, etc. He had also deposited with him by clients and friends sums of money for investment.
These moneys and the funds of the estates committed to him, were mingled with his own funds, in some instances no separate investment or account being kept.
At his death these estates and depositors of course became creditors of his estate, and the duty devolved upon accountant of arranging the various claims and making settlements with the creditors. This required time, money and labor. In order to preserve the assets of the estate from loss and sacrifice, the accountant, if not in the possession of sufficient moneys of the estate, was in the habit of advancing his individual funds and thus discharging the indebtedness of testator, and the same was ascertained and settled from time to time; in the mean-time paying over the income from the real and personal estate to the several cestui que trust.
When accountant filed his first account, in December, 1872, testator having died as stated in August, 1871, the debts of testator had not all been fully paid, and for the reasons mentioned. Accountant still retained the securities and investments made by testator. Said account was referred to an auditor by the former Orphans' Court, to audit, settle and distribute the balance in the hands of accountant. The account was found to be truly correct; but Mr. Miller, as counsel for Mrs. Coggins, one of the cestui que trust, requested the auditor to direct, "that the executor should dispose of the personal property as soon as necessary and pay the debts of the decedents at once," and convert into money all such investments as are not proper for a trustee to hold under the laws of Pennsylvania and invest the proceeds legally.
The auditor being of opinion that he had no authority to so direct the executor, declined to report as he had been requested. *Page 435 
The report of the auditor was prepared for filing on Oct. 16, 1873. But it was not filed, owing to the fact, that accountant being still of the opinion that it would be a disadvantage to the estate to sell the stocks and other investments in his hands, and his counsel desiring, if possible, to amicably arrange the differences between accountant and his sister, the cestui quetrust obtained the report from the auditor, and retained it in his possession with a hope that an amicable settlement might be effected. It is incorrect to say that accountant had retained all the investments of testasor, as it appears that he sold on September 25, 1872, $5,000 Bond Forest Improvement Company at a loss of
 $262 98 And on November 23, 1872, $4,000 bonds of Little Schuylkill Navagation Company at a loss of ............ 27 61 ________ $290 59 And also on November 26, 1872, sixteen shares Delaware County National Bank stock, at a gain of ............ $ 416 00 April 28, 1875, $3,400 Bonds, Lehigh Navigation, at a gain of .................................... 569 50 May 1, 1875, $600 bonds, Lehigh Navigation, at a gain of .................................... 100 50 October 14, 1875, $2,000 bonds, Lehigh Navigation at a gain of ................................. 315 00 August 26, 1876, $3,000 bonds, Lehigh Navigation at a gain of .................................. 562 50 ________ $1,963 50
It also appeared that the special cause of objection was the holding by accountant of the shares of stock of the Lehigh Navigation Company, and as testified by accountant, the report of the auditor was not filed for the additional reason, as understood by him that he was to continue to pay the liabilities of the estate as fast as possible, and when that was done, the report of the auditor should be filed. He accordingly *Page 436 
continued to pay off the debts, and to comply with the request of Mr. Miller, with what he considered would be the least loss to the estate, sold those investments paying the least income, and also three hundred shares of Lehigh Navigation stock, which had not been paying any dividend for some time. In June, 1873, the accountant sold the stock for $39 per share, and in 1874 it rose above par and sold for $52 per share. Upon the remaining shares retained by accountant he received eight per cent. dividend from June, 1874, to June, 1876. In September, 1876, the dividend was reduced to one and a half per cent., and since then none has been paid. The report of the auditor was still in the custody of the counsel for accountant, when the annexed second account was filed in October, 1877. During all this period of nearly four years accountant had been managing the estate as theretofore, paying its debts, and distributing its income among the cestui quetrust.
It therefore became necessary to dispose of the first account before the second could be audited. And accordingly the auditor was requested to hold another meeting and appointed for that purpose, December 28, 1877, at which time he was requested by the counsel for the cestui que trust, Mrs. Coggins, to re-open the audit. This being refused by the auditor, exceptions were filed to his report by Mr. Miller, which were argued before this Court, and dismissed on March 30, 1878.
The accountant, during the whole course of his management of the estate, has endeavoeed to conduct and settle its troublesome and somewhat complicated affairs with the sole intention of promoting the interests of all the parties, he being, as stated, interested to the extent of one-fourth of the income. Being an intelligent and capable business man, he has given the same, if not more labor and attention to the estate than if it had been his individual property. His accounts have been found correct in every particular, both principal and income.
He has been guided by the advice of competent counsel, in all respects evinced care and fidelity, a strong desire to protect and preserve the estate, and exercised his best skill and judgment in husbanding its resources. He sold certain of its securities *Page 437 
for less and others at an increase over their appraised value, and retained the remainder of the investments made by testator because they yielded a larger income than legal investments would have realized, and when one corporation ceased to pay a dividend, he still held the stock from his faith in its ultimate rise in value. Accountant kept a bank account as executor, and a separate bank account as an individual, and while he admitted that he might have deposited moneys of the estate in his own private account, and deposited his own moneys in his executor's account, yet there was no evidence that he thus used the moneys of the estate in his own business, and made any profit thereby.
No request was made that the Court now order and direct the accountant to sell the remainder of the investments in his possession, and Mr. Miller in answer to the inquiry of the auditing judge, stated that he did not now present such a demand, preferring to rely upon his claim to surcharge accountant. In view of all the facts presented the auditing judge is of the opinion that no sufficient reasons have been shown to justify a surcharge of the accountant with the market value of the investments of testator, either at the expiration of one year from the death of the testator, or at date when the demand for a conversion was made before the auditor, or at the present time. The objecting cestui que trust, have displayed great laches and a delay of four years, during which time they received their share of the income from the accountant without objection, which would naturally create the impression that they had either withdrawn their previous demand for a conversion, or acquiesced in the opinion of the executor that it would be injudicious to convert and probably sacrifice the securities of the estate. However, the executor in compliance with the wish of the cestuique trust, but contrary to his judgment, did sell certain of the investments most strongly objected to at a much less rate than they realized the succeeding year, and still retains the remainder.
It is not pretended that he has been guilty of willful mismanagement or negligence, but rather that his judgment and discretion are at fault in believing that it would be advantageous to the interests of the parties to still retain these investments. *Page 438 
He has been acting throughout in good faith and according to his best judgment, and should be protected. Again, although it was admitted that some of the securities held by accountant had depreciated in value, yet non constat that they will not perhaps at an early day reach their former value and declare dividends.
The cestuis que trust do not now demand a sale of the securities, but insist that the accountant should be compelled to take them at a price, much less, perhaps, than would have been realized at the time the demand was made. Under all the circumstances this would be unjust to the accountant, and unwarranted by law or equity. He was not bound to sell the investments of testator immediately after his death, but he, as a trustee, had the right to exercise his best judgment and discretion, and do that which to him, aided by advice of counsel, seemed most advantageous and beneficial to the estate.
The accountant was directed by testator "to manage the whole thereof carefully, so as to preserve and keep the same productive of income," and the evidence shows he endeavored to faithfully discharge this duty. If he erred, it was a mistake of judgment for which he is not liable.
The claim to surcharge the accountant is therefore refused, and as no good reason was shown why he should be deprived the compensation and commissions directed by testator they are allowed.
The balance of the estate in the hands of accountant, as appears from annexed account, is ........................... $125,252 40 From which is to be deducted costs of clerk of Orphans' Court ..................... 23 50 ___________ Balance for distribution ............. $125,228 90 invested in securities, a schedule of which is annexed to the account, and which are awarded to accountant as executor and trustee under the will of testator. _______________
The following is an extract from the adjudication upon the third account filed by Passmore Williamson.
No creditors appeared nor were any claims presented against the estate. *Page 439 
The annexed account was carefully examined and found to be correct, no objections being made thereto, except as thereafter mentioned.
Mr. Miller claimed that accountant should be surcharged with the market value of the securities in the hands of accountant not recognized as legal investments, and also that the commissions of accountant be disallowed.
These objections were also made by Mr. Miller to the confirmation of the second account, as appears upon a reference to the adjudication thereof, and filed herewith.
And as Mr. Miller, in reply to a question from the auditing judge, declined to request the Court to direct accountant to sell and convert the securities and investments in his hands belonging to the estate, it is unnecessary to again state why said objections must be overruled.
The annexed account shows that since the filing of the second account accountant has sold and converted sixty-seven shares of Provident Life and Trust Company stock, for .................. $5,417 12 Leaving unsold in his hands one hundred shares.
The 167 shares were apprised at ............... 9,018 00 Or 854 per share. The sale of sixty-seven shares realized a gain of 1,799 12 Accountant also sold twenty-five shares of Philadelphia Trust and Safe Deposit Company, for 3,004 75 At a profit of .............................. 504 75 And accountant subsequently sold forty-five shares of stock of the Provident Trust Company, for 3,375 37 Appraised at $54 per share. At a profit of .............................. 945 37
Mr. Speakman then stated that as the administration of the estate had been fully closed, and all known debts of the testator fully paid and discharged, it was proper that the estate and assets in the hands of the accountant, as executor, should be transferred to him as trustee. And as accountant had not deducted the entire commission or compensation due him, as executor, from the corpus of the estate, Mr. Speakman claimed *Page 440 
that he be awarded and allowed to retain five per cent. commissions upon the unconverted securities in his possession, the executor having in his account claimed credit for his commissions upon the amount of cash received by him.
In support of the rate of commissions claimed, Mr. Speakman relied upon the fifth clause of testator's will, which is as follows: "I give, devise and bequeath all the rest, residue and "remainder of my estate, both real and personal, whatsoever "and wheresoever, unto my son, Passmore Williamson, his "heirs, executors and administrators; but, nevertheless, upon "trusts and for the uses and purposes following; that is to say, "in trust to manage the whole thereof carefully, so as to pre-"serve "and keep the same productive of income, and to collect "get in and receive the income of the several portions as the "same shall accrue, and after deducting thereout all taxes, cost "of repairs of real estate, and necessary expenses of executing "the trust, which shall include a commission of five per "cent. to himself for his trouble, care and integrity therein, "the net clear income to pay over," etc.
Mr. Miller, however, objected to the allowance of commissions, for reasons mentioned in the adjudication upon the second account of the executor, and also therein passed upon.
Mr. Miller also objected to the rate of commissions claimed as being excessive upon securities unconverted, and for the reason that the five per cent. spoken of by testator in his will had reference to the income from his estate only, and not to the principal.
These last objections must be sustained, as the auditing judge is of the opinion that the commission of five per cent. mentioned in the will had reference to the compensation of the trustee, and not that of the executor; and further, in harmony with the well-settled practice of not awarding the same rate of commissions, or compensation, where the executor still retains unconverted investments made by his testator, as where he has been obliged to sell the same for the purpose of paying debts or making distribution, we think the rate claimed, namely five cent., should be reduced to two and a half per cent. Compensation to accountant to *Page 441 
this extent, is, therefore allowed and awarded to him out of the investments and securities in his hands; and the balance of the said securities and assets is awarded to him as trustee.
Mr. Speakman also claimed that an allowance be made to accountant of the sum of $500 for professional services and advice of counsel rendered in the management and settlement of the estate and audit of his accounts.
Mr. Miller objected also to this allowance. First, because up to the end of the auditor's report Mr. Speakman fixed his own fee, and there was an adjudication up to that time and since then he has shown no ground for charging the additional amount which he now charges.
In regard to this allowance asked for, the record, as well as the evidence, shows that the accountant has been obliged to employ the services of counsel ever since the filing of his first account in 1873.
This account was referred to an auditor by our predecessors, before whom accountant and his counsel attended for months, resisting the attempts on the part of some of the cestuis quetrust to surcharge and otherwise render him personally liable. But these efforts failed and his account was found to be correct in every particular. After the auditor's report was prepared it was not filed for a period of between three and four years, during which time counsel was still employed in endeavoring to effect an amicable settlement of the differences of opinion as to the proper management and settlement of the estate, between the accountant and his sisters, the objecting cestuis que trust, and advising accountant from time to time upon matters connected with the estate. At the end of the time referred to the auditor was requested to call another meeting of the parties before him.
He did so, and when the parties met, an effort was made by thecestuis que trust to re-open the audit, which the auditor refused. Exceptions were filed to his report, argued before him and overruled, whereupon the exceptions were afterwards argued before the Court and dismissed.
The accountant then filed a second account, which was called for audit before one of the judges of this Court. A number *Page 442 
of meetings were held, at which the account was carefully and closely scrutinized, the accountant examined and cross-examined, claims to surcharge made and credit objected to, and arguments of counsel heard.
A third or final account was then filed, the same being here-unto annexed. This was also closely examined, claims to surcharge again made, testimony again taken, and the account found to be correct.
During all these proceedings the services of counsel were required by counsel, not in prosecuting any personal claim he had against the estate, or defending his negligence or default, but in substantiating the correctness of his account to the satisfaction of the cestuis que trust, and in resisting their efforts to surcharge him without a legal cause. That an executor is entitled to a reasonable allowance out of the estate for the services and advice of counsel cannot be questioned; therefore the only question now is whether the amount asked for is reasonable and proper.
In view of the length of time during which the services of counsel were necessary, the nature of the litigation, the variety of the labors performed by counsel, both before the auditor and the Court, the amount of the estate, the responsible duties of counsel, and the right of accountant to engage reputable and capable members of the bar to advise, assist and defend him, the auditing judge is of the opinion that the allowance requested is not exorbitant but reasonable, and is therefore granted.
Exceptions were filed to these adjudications, which were overruled on December 28, 1878, in the following opinion, per