595

## Mellier's Estate

Before Henderson, Van Dusen, Stearne and Sinkler, JJ.

*Thomas Raeburn White* and *Raymond M. Remick,* for exceptant.

*Robert T. McCracken,* contra.

VAN DUSEN, J., February 17, 1933.—When decedent died, his supposed widow took out letters of administration. Her status soon appeared doubtful, and another widow and two children appeared. Negotiations went on for nearly four months, as a result of which a written agreement was signed on September 24, 1930, whereby it was agreed that the administratrix should resign and be discharged and that a new administrator should be appointed to be chosen by counsel for the children, that the supposed widow (known as Mrs. Wallace) should receive $21,000 out of the estate, payable in instalments on the 24th of each month from October to January, and all the other parties in interest assigned their distributive shares to her so far as necessary to make the payments. The present trust company accountant was chosen administrator, but was not actually appointed until October 22nd. The delay was not its fault or the fault of Mrs. Wallace. It was contemplated when the agreement was signed that this trust company would be appointed, and it received a copy of the agreement about the time it was signed.

Decedent's estate consisted of speculative securities to a large amount, some of them deposited with a broker to secure a margin account, and others deposited with a bank to secure a loan. During the time that Mrs. Wallace had been administratrix, the value of these securities had shrunk very much. At the request of the children she sold nothing. The value shrunk still further by the day the trust company became administrator, and that day the net assets were worth in the market very little more than $21,000 (say $28,000), the amount which it was agreed should be paid to her.

On October 24th, 27th and 28th, Mrs. Wallace, through interviews of her counsel with the trust officer of the administrator, advised him of the condition of the estate, and demanded that the securities of the estate be sold so that she could be paid. Counsel for the children opposed this. By letter dated November 6, 1930, Mrs. Wallace's counsel made another such demand and notified the trust company that it would be held responsible if nothing was done.

It does not appear that anything was done by the accountant in response to these demands. On November 5th, however, the broker demanded more margin. On November 6th, the trust officer gave orders to sell certain items, and they were sold at once. On November 8th, the broker gave notice that more must be sold, and more securities were sold on the 10th. On that day the broker notified the trust officer that all the securities must be sold, including one item which the trust officer had evidently requested should be saved if possible, and sales of all the remaining securities deposited with the broker were made on the 11th and the 15th. The broker was paid, but practically nothing was realized for the general estate.

On November 5th, the bank also sent a call for margin, which was received by the trust officer on the same day. On the same day he gave instructions to the bank to "sell out." The first sales were made on November 10th, and enough securities were finally sold by November 26th to pay the loan. Three items which remained unsold were returned to the trust company. It does not appear that any instructions were given to the bank as to the securities which should be sold or that any restriction was put on sales.

The auditing judge surcharged the administrator with the market value of all securities of the estate on November 6th.

It is the duty of an administrator to use his own judgment in the matter of selling assets, after consideration and with advice: Waddell's Estate, 196 Pa. 294; Taylor's Estate, 277 Pa. 518; Brown's Estate, 287 Pa. 499; Dempster's Estate, 308 Pa. 153.

But still, unless the parties express a wish to take in kind, his duty is to convert, and not to speculate: Tyson's Estate, 80 Pa. Superior Ct. 29. An administrator who sells readily marketable securities with reasonable promptness is in the happy position of having nothing to explain.

If the estate owns securities which are pledged for decedent's debt, a wrong guess as to the course of the market may result in wiping out the whole estate. In Elverson's Estate, 15 D. & C. 383, we said, speaking of speculative stocks which had been pledged for a loan: ". . . Whatever the nature of the stocks, it was the duty of the administrator d. b. n. c. t. a. at least to sell enough securities to pay the debts, expenses and taxes and provide for the legacies at once, and to take no chances on the market of the future." It is not necessary to the present decision to say that the administrator must sell pledged securities at once on pain of being surcharged if the market goes down. But we do say that such a situation requires immediate and thoughtful attention, and that the duty to convert and not to speculate becomes more imperative than ever.

The administrator is not to be put in the wrong by one party in interest or another notifying him to sell or not to sell, and then seeking to hold him responsible if their way turns out to have been better than his way: Waddell's Estate, supra. But if all parties in interest request him to sell, he should do so.

What if parties having a preferred position request the administrator to sell, and those who hold the equity in the securities do not? That is this case. We think that this is the situation which is in mind in the decisions cited to us in which it is said that an administrator is held to a stricter duty toward creditors than toward legatees: M'Nair's Appeal, 4 Rawle 148; Brown's Appeal, 1 Dal-

las 311; Bruner's Appeal, 57 Pa. 46; Coggins' Appeal, 3 Walker 426. Creditors come first, and are to be paid in money, not by a fraction. Mrs. Wallace was a preferred distributee by virtue of the assignment of interest by the others, and was to be paid in money, and, like a creditor, she was entitled to have enough money raised to pay her.

At the time the administrator got control, the net estate was barely sufficient to pay her, and the administrator, from the agreement and the demands of her counsel, knew this. We do not regard the administrator as the "liquidating agent" of the parties under the agreement. Mrs. Wallace had no direct claim against the administrator. We place our decision squarely on the right which she acquired by that agreement against the heirs, which entitled her to have her wishes respected as theirs would be until reasonable provision was made for paying her. As the auditing judge said, "her demand was the voice of all." It must follow that if those wishes had been respected, the other heirs would have had no ground of complaint if the market had gone the other way. To this situation we add for good measure the fact that the estate consisted for the most part of pledged securities.

We, therefore, do not take up the question whether the trust company gave proper consideration to the problem of sale or no sale. All that appears in evidence is the statement of the trust officer that he was not influenced by the request of counsel for the children, and that "I acted as I would in any other matter." Counsel for accountant requested in his argument that the matter be re-opened for the production of testimony on this point, but we refuse the request because such evidence would not change the result.

We have also refrained from referring to the supposed fact that the market was going down. The market had previously gone down, but no man knew what it would do next day. If every reasonable man so thought, there would be few buyers on that day. What had happened warned the administrator of what might happen, to Mrs. Wallace's injury, and certainly was no reason to relax his duty to sell with reasonable promptness; and especially to sell pledged securities.

We agree with the auditing judge that the administrator did not act with reasonable promptness with respect to the securities which were pledged with the broker and the bank. So far as was necessary to pay them off, the administrator could have ordered a sale by a telephone call on October 24th, the day the first demand was made, and, judging by the results when the order was finally given, sales would have been effected within a few days. The broker seems to have been able to sell almost on the very day that permission was given him. Even granting that the administrator must inform itself as to the nature of the securities, possible market price, price trends, etc., two weeks was ample to make the investigation and get the sales through.

The situation is different with regard to the securities held by the broker and the bank which they did not have to sell to pay their loans. Once the loans were paid, the decedent's transfers of registered securities were revoked by his death. Although it is testified that pledgees will sometimes sell securities under such circumstances by virtue of the decedent's transfer, they ought not to do it and ought not to be asked to do it. Before registered securities can be sold, or at least stocks, it is necessary to get waivers and furnish the transfer agent with certified copies of wills, etc. It is not possible to sell instantly; it takes an appreciable time to get the securities in shape for sale. Before waivers can be obtained, payments on account of taxes must be made. We do not know what money the administrator had in hand for this purpose. With bonds payable to bearer, the situation is different.

598

At this point the difficulty arises that if enough pledged securities had been sold by November 6th to pay the loans, it would not have been necessary to sell quite so many items, and more items would have been returned to the administrator unsold. The securities which the broker held were worth, on November 6th, $28,624.38, and they were actually sold for $26,667.71. The broker sold everything and returned $31.50 cash. What items would have been returned, and would they have been stocks or bonds, if due diligence had been observed? This difficulty was created by the negligence of the administrator, and as we cannot speculate on what might have been so released, the administrator must be charged with the November 6th value of all these items.

So also in the case of the bank. From Exhibit No. 2 we observe that it sold under the pledge securities as follows:

| | |
|---|---:|
| Proceeds as per "sales values" column | $99,354.19 |
| Less $2500. Pennsgrove Water Supply 5s of 1935 returned to the administrator in kind and promptly sold by it without loss | 1,118.75 |
| | $98,235.44 |

These securities on November 6th were worth as follows:

| | | |
|---|---:|---:|
| November 6th value of all securities pledged with the bank | | $112,602.25 |
| Less November 6th value of securities not sold by the bank and returned to the administrator: | | |
| 50 Shs. Central States Electric Corporation, convertible preferred | $4,925.00 | |
| 40 Shs. Central States Electric Corporation, new preferred of 1929 | 3,060.00 | |
| $2500. Pennsgrove Water Supply 5s, 1935 | 1,118.75 | |
| | | 9,103.75 |
| | | $103,498.50 |

For the same reason the administrator must be charged with the November 6th value of the items which the bank actually sold.

The three items returned by the bank are mentioned above. The Pennsgrove bonds were sold by the administrator at once for the price which had obtained since September. The Central States stock was physically received December 9th, was sent out for transfer December 12th, and new certificates in the name of the administrator were received March 21st. Why this took so long we do not know.

According to Exhibit No. 2 this stock was on hand unsold a year later. In view of the demand for a sale, this seems to us prima facie an unreasonable delay, and the burden is on the accountant, to explain it. It is the one with knowledge of the practical difficulties, the lack of a market, and the like. No explanation was given in this case, and in the absence of proof there is nothing to do but fall back on the value as of the time of its appointment which appears in Exhibit No. 2. The auditing judge gave the administrator the benefit of the lower prices two weeks later, and it cannot complain of that.

There were other securities consisting of stocks in the name of the decedent which were in the possession of a woman known as Mrs. Mellier, who probably was decedent's lawful wife. She claimed them as a gift, but it was a feeble claim, and under the advice of her counsel she surrendered the securities to the administrator after many months of inactivity on its part; they are still unsold. The

auditing judge has surcharged the administrator with the value of these securities on November 6th. There appear to be still other assets which are listed in Exhibit No. 2 as "miscellaneous," of which two items were sold a year later at a loss, and the others were on hand a year later unsold. Here again knowledge of the difficulties, if any, is in the possession of the accountant. It has shown nothing, and in the absence of explanation, cannot complain of the action of the auditing judge.

Exceptions Nos. 8 and 9 were not argued and we think advisedly so.

All the exceptions are dismissed, and the adjudication is confirmed absolutely.